**EXHIBIT A**

**TO**

**DEFENDANT'S THIRD PARTY COMPLAINT**

**CASE NO.: 1:20-cv-22977**

14299262v1

# PUNCHH SERVICES AGREEMENT

This Services Agreement (the "*Agreement*") is entered into on __Mar 31, 2015__ (the "*Effective Date*") between Punchh, Inc., a Delaware corporation having its principal office at 530 Lakeside Dr Suite 240, Sunnyvale, CA 94085 ("*Punchh*"), and CiCi Enterprises LP ("*Customer*") with corporate headquarters located at 1080 West Bethel Road, Coppell, TX 75019.

Pursuant to the terms set forth herein, Punchh will provide an online and mobile interface for Customer, develop and host a private-label mobile application for Customer and provide such other services as set forth herein.

NOW, THEREFORE, in consideration of the terms and conditions contained herein, the parties agree as follows:

**1.    DEFINITIONS.**

**1.1**   "*App Store*" means the app store or distribution platform where a mobile application must be uploaded, submitted, or subject to approval of a third party for inclusion and availability on the applicable mobile platform, (e.g., the Apple App Store, and Google Play).

**1.2**   "*Customer Content*" means all information, data, text, visuals, graphics, artwork, animation, video content, or other content or materials, including any Updates thereto, as further described in Exhibit A attached hereto.

**1.3**   "*Customer Locations*" means an individual storefront specifically set forth in Exhibit C, attached hereto.

**1.4**   "*Customer Web Dashboard*" means the website Punchh.com accessible via the internet which is intended for use only by Customer's owners, employees or other authorized designees to administer Customer's Promotional Programs.

**1.5**   "*Customized Content*" means content created and/or developed by Punchh that (i) utilizes Customer Content, (ii) is created solely for Customer for use in the Private Label App and (iii) excludes any Punchh Software.

**1.6**   "*IPR*" means patent rights (including patent applications and disclosures), copyrights, Marks, trade secrets, know-how and any other intellectual property rights recognized in any country or jurisdiction in the world.

**1.7**   "*Marks*" means the trademarks, service marks, logos or trade names used by a party to identify itself and/or its products and services during the Term.

**1.8**   "*Order Form*" means an appendix to this Agreement that describes the commercial terms of the products that the Customer agrees to purchase from Punchh.

**1.9**   "*Private-Label App*" means the mobile application that incorporates the Customer Content and is accessed independently from the Punchh App.

**1.10**  "*Promotional Programs*" means any of Customer's customer acquisition, customer retention, and/or marketing programs that are incorporated into the Private-Label App and other promotional use of the Private-Label App by Customer.

**1.11**  "*Punchh App*" means the Punchh mobile application that Punchh develops for all mobile handheld devices on all platforms, and any and all Updates, Upgrades and future enhancements that Punchh develops for such mobile application.

**1.12**   *"Punchh Software"* means any Punchh or third party software used by Punchh to provide the development, processing, hosting and analytic services provided by Punchh in connection with Punchh's business, the Punchh App and Private-Label App.

**1.13**   *"Statement of Work"* also known as "SOW" means an appendix to this Agreement that describes the commercial terms and project plan that the Customer agrees to purchase from Punchh.

**1.14**   *"Update"* means a software download for the Private-Label App through the iPhone App Store or Android Play for the Private-label app to address bug fixes and dependency based updates like a mobile operating system.

**1.15**   *"Upgrade"* means a software download for the Private-Label app through the iPhone App Store or Android Play Store to address new or additional customer requirements.

**1.16**   "*User*" means an individual who downloads the Private-Label App on his/her mobile handheld device and registers with Punchh to use the Private-Label App.

**1.17**   "*User Data*" means all (a) non-personally identifiable, aggregate User data, including any aggregate or statistical information relating to User's usage of the Private-Label App, obtained or collected by Punchh in connection with the Private-Label App; and (b) opt-in user registration data or other personal User information, obtained or collected by Punchh in connection with the Private-Label App.

**2.   PRIVATE-LABEL APP**

**2.1**   <u>Development of the Private-Label App</u>. Subject to Customer's payment of applicable fees, Punchh shall develop the Private-Label App to include the Customer Content and Customer Marks as described in <u>Exhibit A</u>. Customer will provide Customer credit card details or other payment method details to Punchh on or before the Effective Date. Upon completion of the Private-Label App, Punchh shall deliver a copy of the Private-Label App to Customer. After receiving the copy of the Private-Label App, Customer shall distribute the Private-Label App in accordance with Section 2.5 below.

**2.2**   <u>License to Private-Label App</u>. Subject to Customer's compliance with the Agreement, and without additional royalties Punchh hereby grants solely to Customer, its affiliates or third parties operating on its behalf a non-exclusive worldwide, transferable and sublicensable right to: (i) distribute the Punchh Software as part of the Private Label App by uploading it to the App Store; (ii) modify, monitor and manage the Punchh Software as part of the Private Label App; and (iii) manage, organize and perform Promotional Programs utilizing the Punchh Software as part of the Private Label App.

**2.3**   <u>License to Customer Content</u>. Customer hereby grants to Punchh a non-exclusive, non-transferable, royalty-free, worldwide license, ,to reproduce, digitize, adapt or modify format (without any change to the text expression or substantive content thereof), transmit, distribute, perform, publicly display, create derivative works based on, and otherwise use the Customer Content solely in connection with (a) creating, operating, maintaining, servicing, displaying, supporting and hosting the Private-Label App, and (b) permitting Users to access, display and transmit the Customer Content via the Private-Label App. Upon termination or expiration of this Agreement, Punchh will have no obligation to remove such Customer Content from any User's mobile handheld device, provided that upon such termination or expiration, the User will not receive new or refreshed Customer Content for the Private-Label App.

**2.4**   <u>Restrictions</u>. Customer acknowledges that the Private-Label App contains Punchh Software, which is licensed, not sold. Except as authorized herein, Customer shall not: (i) copy, reverse engineer, decompile or disassemble the Punchh Software (as incorporated into the Private-Label App); (ii) make the Private-Label App, in whole or in part, available to any other persons, entity, or business, except affiliates, service providers and other representatives of Customer, and other end users of Customer; (iii) modify the Private-Label App or Punchh Software (as incorporated into the Private-Label App); or (iv) combine the Punchh Software (as incorporated into the Private-Label App) with any other software services not provided or approved by Punchh.

**2.5** Distribution. Customer will manage distribution of the Private-Label App for the Customer Locations during the Term. Customer shall upload and/or submit the Private-Label App along with any required documents to the applicable App Store for listing and/or approval. Customer shall register and/or submit the Private-Label App to App Stores under Customer's name or shall request Punchh to submit the Private-Label App. The Private-Label App may only be distributed through App Stores. Customer shall be responsible for providing terms of use and a privacy policy that govern the Private-Label App, subject to Punchh's approval. Customer acknowledges and agrees that its ability to exploit and distribute the Private-Label App is dependent upon and subject to third parties, including the operators of App Stores. Customer shall enter into and maintain all applicable development agreements with the App Stores (collectively, the "***App Store Agreements***"). If Customer, with reasonable assistance from Punchh, is not able to get its Private-Label App accepted to the App Stores, Punchh will refund the setup fee and this Agreement will be terminated so that the Customer is not liable for any further fees.

**2.6** Hosting. The parties agree that Punchh (or Punchh's subcontractors or sub-licensees) will be responsible for hosting and operating the Private-Label App in accordance with the Service Level Commitment in Exhibit B. Notwithstanding anything to the contrary, Customer acknowledges and agrees that Punchh is not responsible for and will not be liable for any failure by, error of, or defect in, any third-party (including and Users') network or hardware which may contribute to the functionality or availability of the Private-Label App.

**3.   FEES AND REPORTS**.

**3.1** Fees. Terms that are not otherwise defined in this Agreement have the meanings and values set forth in the attached Order Form. Customer shall pay to Punchh the applicable fees for the Services as set forth in the attached Order Form. Fees are due and payable at the beginning of the Term unless otherwise specified in the Order Form. If Customer provides credit card information to Punchh, Customer authorizes Punchh to bill such credit card at the time Customer orders any Services, for all Services and the amount set forth in the Order Form, and at the time of any renewal, for the amount charged for any renewal Term(s) as mutually agreed by the parties. If Customer did not pay by credit card, Punchh shall bill Customer through invoice, in which case payment for undisputed charges is due 30 days from the invoice date or as described in the Order Form, which shall in no event be less than 30 days from the invoice date. Delinquent payments for undisputed charges that remain past due 30 days after Customer has received notice thereof are subject to late payment fees equivalent to 1.5% of the overdue balance per month (or the maximum permitted by law, whichever is lower), plus any expenses associated with collections. Fees are exclusive of all taxes, levies, and duties imposed by taxing authorities, and Customer is responsible for all such taxes, excluding taxes based solely on Punchh's income. If and when additional locations are added to Customer's account as agreed by the parties in writing, Customer will be invoiced for such additional locations, which will be prorated for the balance of the then-current Term. Any billing disputes must be reported to Punchh in writing within 60 days of the date of the invoice. All fees paid are non-refundable, except as provided herein. If Customer's account is past due 30 days or more after Customer receives notice thereof (except with respect to fees or charges for which there is a reasonable and good faith dispute), Punchh may suspend the Services upon prior written notice without liability until such amounts are paid in full, in addition to any of its other rights or remedies; provided that Punchh shall resume suspended Services immediately upon payment of such overdue amount.

**3.2** Reports. Punchh will, during the Term, make its online reporting system available to Customer via the Customer Web Dashboard so that Customer can monitor usage of the Private-Label App.

**4.   INTELLECTUAL PROPERTY RIGHTS.**

**4.1** Proprietary Rights. Punchh acknowledges that Customer or its licensors are the sole owners of all IPR in and to the Customer Content and the Customer Marks. Punchh will not acquire any rights in the Customer Content and the Customer Marks by virtue of this Agreement, except as expressly set forth in this Agreement. Customer acknowledges that Punchh or its licensors are the sole owners of the Punchh Software. Customer will not acquire any rights in the Punchh Software, except as expressly set forth in this Agreement.

**4.2** <u>Customized Content</u>. Subject to receipt of full payment, Punchh hereby assigns and transfers to Customer any and all of Punchh's right, title and interest in Customized Content created pursuant to the terms of this Agreement.  If any portion of the Customized Content cannot, by operation of law, be deemed a "work made for hire", then Punchh grants to Customer an exclusive, perpetual, royalty-free license to use such portion(s) of the Customized Content for all purposes deemed necessary or desirable by Customer.

**4.3** <u>User Data</u>.  To the extent permitted by (a) applicable law and (b) Punchh's privacy policy in effect at the time such data was collected, Punchh will provide User Data to Customer, periodically  or within two (2) days of Customer's request during the Term in a format that is mutually acceptable to the parties. All User Data will be owned by Customer.  Punchh will not share the User Data with any third parties for any purpose. Punchh retains the right to use the User Data for its internal purposes to modify, improve and/or enhance the Punchh services and Punchh Software, including but not limited to the Private-Label App and Punch App. Punchh can also use the aggregate data to consolidate with other customers data, in order to create aggregate reports that do not refer to any specific customer but provide statistics on an industry segment.

**4.4** <u>Trademark Licenses</u>. During the Term, (i) Customer grants to Punchh a personal, non-exclusive, non-transferable license to use the Customer Marks solely in connection with Punchh's creation, marketing, promotion, and distribution of the Private-Label App pursuant to this Agreement and (ii) Punchh grants to Customer a non-exclusive, non-transferable license to use the Punchh Marks solely in connection with Customer's promotion of the Private-Label App pursuant to this Agreement. Any and all goodwill and other proprietary rights that are created by or that result from a party's use of the other's Marks hereunder inure solely to the benefit of the owner of such Marks. Each party shall at all times recognize the validity of the marks owned by the other party and the rights and title of the owner therein.  The parties shall not, during the term of this Agreement or thereafter, attack, impair or put in issue the title or any rights of licensor in and to it marks or attack the validity of the license granted herein. Each party agrees to assist the licensor in the protection and defense of any of its rights in its marks, in the filing and prosecution of any trademark applications, renewals, and the like, in the recording of this Agreement or any other relevant agreements, and in the doing of any other acts with respect to the licensor's marks, including the prevention of the use thereof by any unauthorized persons, that in the judgment of the licensor may be necessary or desirable under any law, regulation or decree of the United States. Each party agrees to notify the other party promptly in writing of any infringements or  imitations by others of the other party's marks which come to its attention and the licensor shall have the sole right to determine whether or not any action shall be taken on account of any such infringements or imitations.  Each party shall not have any rights against the other party (or any parents, subsidiaries or other affiliates thereof, and the respective officers, directors, owners, agents and employees of each of them) for damages or other remedy by reason of owner's failure to prosecute any alleged infringements or imitations by others of it marks. Each party agrees that it will never take or continue any action which it knows or has reason to know would result in or cause a boycott of any product or service bearing the other party's marks, or threaten to injure or diminish the image or reputation of the party that owns the marks or any products or services offered under such Marks.  In the event any action taken or continued by the party licensed to use the other party's marks hereunder results, or threatens to result, in any such injury, then the party licensed to use the other party's marks agrees to promptly take all steps reasonably necessary to avoid or stop the occurrence of such injury.

**5.** **CONFIDENTIAL INFORMATION**. Each party shall retain in confidence the terms of this Agreement and all non-public information and know-how of the other party disclosed to or acquired by such party (the "***Receiving Party***") in connection with this Agreement which is either designated as confidential or which by the nature of the circumstance ought in good faith to be treated as confidential, including,

non-public pricing and cost information, business plans and sales information ("***Confidential Information***"). Each party may, notwithstanding the foregoing, disclose the terms and conditions of this Agreement to its (i) affiliates and the consultants and agents of such party and its affiliates, as reasonably necessary in the ordinary course of its business or (ii) as compelled by court order, subpoena or similar instrument compelling disclosure or as otherwise required by law, provided that the party being compelled to make the disclosure shall (to the extent legally permitted) provide prompt written notice of such required disclosure to the other party and allow such other party the opportunity to seek a protective order. Each party agrees to hold and to cause its affiliates and the consultants and agents of such party and its affiliates, to hold, any and all such Confidential Information of the other party in confidence, and to protect the Confidential Information of the other party from unauthorized disclosure, employing precautions at least as great as those taken to protect its own confidential information of a similar nature. Notwithstanding the foregoing, Confidential Information shall not include any information that: (i) was known by the Receiving Party prior to disclosure thereof by the other party; (ii) was in or entered the public domain through no fault of the Receiving Party and not in violation of this Agreement; (iii) is disclosed to the Receiving Party by a third party legally entitled to make such disclosure without violation of any obligation of confidentiality; or (iv) is independently developed by the Receiving Party without reference to any Confidential Information of the other party.

**6.     TERM AND TERMINATION**

**6.1**     Term. The term of this Agreement (the "Term") will commence upon the Activation Date and will, unless terminated as provided herein, continue for 24 months. After 12 months from the Activation Date, Customer may cancel with 180 days advanced written notice. After 24 months, the Agreement will continue automatically and Customer may cancel upon 30 days written notice, while Punchh may cancel upon 60 days written notice. The Agreement shall also extend for the length of any outstanding Order Form.

**6.2**     Termination for Breach. Either party may terminate this Agreement upon 15 days written notice if the other party is in material breach of any of its obligations under this Agreement and such party fails to remedy the breach within such 15 day period.

**6.3**     Effect of Termination or Expiration. Upon any termination of the Agreement, Punchh will cease the functionality of the Private-Label App. Punchh shall have no liability to Customer related to failure of the Private-Label App to operate after such termination. Upon any termination of the Agreement, Punchh will return the database of User Data to the Customer.

**6.4**     Survival. Sections 4, 5, 7.3, 8 and 9 shall survive any expiration or termination of this Agreement.

**7.     REPRESENTATIONS AND WARRANTIES.**

**7.1**     Customer. Customer represents and warrants that (i) it has the necessary rights to grant the licenses granted hereunder; (ii) the Customer Content and Customer Marks, and the use thereof as contemplated and authorized in this Agreement, do not and will not infringe upon the IPR of any third party; (iii) the Customer Content and Customer Marks, and the use thereof as contemplated and authorized in this Agreement, do not and will not violate the publicity or privacy right of any third party, or defame any third party; (iv) all Promotional Programs are in compliance with all applicable laws and no consent or other permissions or authorizations are required for the operation of such Promotional Programs; and (v) it shall enter into and maintain compliance with all applicable App Store Agreements. Customer will have no obligation or other liability with regard to any non-compliance with these representations and warranties that is caused by Punch's negligence or the misuse or improper use of the User Data or Customer Marks by or on behalf of Punchh.

**7.2**     Punchh. Punchh represents and warrants that (i) the Private-Label App (excluding Customer Content and Customer Marks), Punchh Software, Punchh App and Punchh Marks will not infringe upon the U.S. copyright, patent, trademark or trade secret rights of any third party, and (ii) its services will be performed in a good and workmanlike manner and in compliance with all applicable laws and regulations, and (iii) the Private-Label App shall substantially conform to the documentation provided. Punchh will have no obligation or other liability with regard to any non-compliance with these representations and warranties

that is caused by Customer's negligence or the misuse or improper use of the Private-Label App by or on behalf of Customer.

**7.3** Limitations. THE REPRESENTATIONS AND WARRANTIES OF CUSTOMER AND PUNCHH AS SET FORTH IN THIS SECTION 7 OR OTHERWISE IN THIS AGREEMENT ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES MADE BY THE PARTIES. EACH PARTY EXPRESSLY DISCLAIMS, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, - AND DATA ACCURACY. THE PARTIES AGREE THAT PUNCHH IS NOT INVOLVED IN SELECTING THE ELEMENTS OF THE PROMOTIONAL PROGRAMS AND DISCLAIMS ANY AND ALL LIABILITY RELATING THERETO.

**8. INDEMNIFICATION; LIMITATION OF LIABILITY.**

**8.1** Indemnification. Each party (an "*Indemnifying Party*") shall indemnify, defend and hold the other party, its affiliates and each of its officers, directors, employees and agents harmless from any and all claims or damages incurred or suffered by such party arising out of, or in connection with any third party claim based upon or arising out of or alleging facts constituting any breach of this Agreement by the Indemnifying Party or the Indemnifying Party's gross negligence or willful misconduct.

**8.2** LIMITATION ON LIABILITY. EXCEPT FOR EACH PARTY'S INDEMNIFICATION OBLIGATIONS, IN NO EVENT WILL (1) EITHER PARTY'S TOTAL LIABILITY TO THE OTHER UNDER THIS AGREEMENT, FROM ALL CAUSES OF ACTION AND UNDER ALL THEORIES OF LIABILITY, EXCEED THE AMOUNT OF PAYMENTS ACTUALLY MADE BY CUSTOMER TO PUNCHH UNDER THIS AGREEMENT DURING THE 12 MONTHS PRIOR THE CLAIM ARISING AND (2) EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS, LOSS OF USE, LOSS OF DATA OR LOSS OF GOODWIILL) ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE USE OR PERFORMANCE OF THE APPLICATIONS OR ARISING OUT OF ANY SERVICES PROVIDED BY PUNCHH HEREUNDER, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED UPON BREACH OF CONTRACT, BREACH OF WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, AND WHETHER OR NOT PUNCHH HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

**9. GENERAL**

**9.1** Assignment. Neither party may assign or transfer this Agreement without the other party's express prior consent; provided however, that either party may assign or transfer this Agreement with notice in connection with (i) the merger of the assigning party with another entity; (ii) the sale of the majority of voting stock of the assigning party; or (iii) the sale of all or substantially all of the assigning party's assets or business to which this Agreement relates. Any attempt to assign or transfer this Agreement without such consent will be null and of no effect. Subject to the foregoing, this Agreement will bind and inure to the benefit of each party's permitted successors and assigns.

**9.2** Governing Law and Jurisdiction. This Agreement will be governed by and construed in accordance with the laws of Delaware, excluding conflict of law principles. Any legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts, including, but not limited to, the Delaware Court of Chancery located in New Castle County, Delaware, and the parties hereby irrevocably consent to personal jurisdiction and venue therein; provided, however, that either party may seek interim or temporary injunctive relief in any court of competent jurisdiction to remedy or prevent any actual or threatened breach of confidentiality pending ultimate resolution of the dispute as described above.

**9.3** Severability. If a court of competent jurisdiction finds any provision of this Agreement invalid or unenforceable, that provision of the Agreement will be enforced to the maximum extent permissible and the other provisions of this Agreement will remain in full force and effect.

**9.4** <u>Waiver</u>. The failure by either party to enforce any provision of this Agreement will not constitute a waiver of future enforcement of that or any other provision.

**9.5** <u>Notices.</u> All notices required or permitted under this Agreement will be in writing and delivered by confirmed facsimile or other electronic transmission, by courier or overnight delivery services, or by certified mail, and in each instance will be deemed given upon receipt. All communications will be sent to the addresses set forth above or to such other address as may be specified by either party to the other in accordance with this Section.

**9.6** <u>Force Majeure.</u> Neither party will be responsible for any failure or delay in its performance under this Agreement due to causes beyond its reasonable control, including, but not limited to, labor disputes, strikes, lockouts, shortages of or inability to obtain energy, raw materials or supplies, war, terrorism, riot, or acts of God.

**9.7** <u>Relationship of Parties.</u> The parties to this Agreement are independent contractors and this Agreement will not establish any relationship of partnership, joint venture, employment, franchise or agency between the parties. Neither party will have the power to bind the other party or to incur any obligations on its behalf without the other party's prior consent.

**9.8** <u>Entire Agreement</u>. This Agreement, including these terms, the related Order Form and all Exhibits hereto, constitutes the complete and exclusive understanding and agreement between the parties regarding its subject matter and supersedes all prior or contemporaneous agreements or understandings, written or oral, relating to its subject matter.

IN WITNESS WHEREOF, the duly authorized representatives of the parties have executed this Agreement and have rendered it effective as of the Effective Date.

**Punchh, Inc.:**    **Customer:**

Signature: _[signature]_    Signature: _Sarah McAloon (Mar 31, 2015)_

Print Name: _Teddy Grossman_    Print Name: Sarah McAloon

Title: _Vice President, Sales_    Title: CMO

**EXHIBIT A - Punchh Order Form**

**Customer:** CiCi Enterprises LP. ("*Customer*") with corporate headquarters located at the address 1080 West Bethel Road, Coppell, TX, 75019.

**Summary Pricing Info:**

| **Subscription Services** | Punchh Marketing Automation Platform | **Services Activation Date** | |
|---|---|---|---|
| **Professional Services** | Design Private-Label Mobile app; design of loyalty program card and collateral as well as managed services of project implementation and ongoing program efficacy and user experience | **Payment Terms** | Net 30 days upon receipt of invoice |
| **Contract term**: | 24 months from this initial order and subsequent orders from affiliated concepts or brands will be co-terminus with this initial order | **Purchase Order #** | |

**Subscription Services Details:**

**Services**: Punchh Marketing Automation Platform & Private-label Mobile Apps

(Terms set forth in this Order Form shall supersede any conflicting terms in any other agreement between parties)

See below for both a one-time set up fee for CiCi's private label app and subscription monthly services.

**Private-label Mobile App Fees:**

| **Private-Label App One-time Setup** | |
|---|---|
| **Private Label Mobile App Design and Maintenance** | Included |
| **POS Integration (Xpient, Granbury, Datapoint)** | Included |
| **CRM & Analytics Integration** | Included |
| **One-time setup** | **$ 75,000** |

| **One-time Setup Cost - Optional App Modules** | |
|---|---|
| **Third Party Integration for Online Ordering** | Waived |
| **Third Party Integration for Mobile Payments*** | $ 10,000 |
| **iBeacon Installation**** | $ 7,500 |
| **Surveys** | $ 10,000 |
| **inMoment Integration** | TBD |
| **Gamification (in - house re-skin)** | $15,000 |
| **3rd Party Gaming Integration** | $2,000 |

*Third Party Integration for Third Party Mobile Payments does not cover the transaction fee or additional hardware.

**Beacon installation does not include physical cost of Beacons @ ~$42 per device

**One Time Set Up Cost for Optional App Modules** – Pricing will not change for these additional modules for the lifetime of the contract.

|  |  |
|---|---|
|  | **Monthly Pricing** (Per Location Per Month): Monthly subscription fees will be based on the Variable Price Schedule below, paid quarterly: <br><br> | **Monthly Fees Per Locations** | |  |---|---| | **CRM & Analytics** | Included | | **Reviews + Sentiment Analysis** | Included | | **Referrals** | Included | | **Loyalty** | Included | | **Total per Location** | **$55** | <br><br> | **Monthly Fee per Location – Optional App Modules** | | |---|---| | **Mobile Payments Support & Maintenance** | $ 5 | | **Data Insights Analyst** | $ 5 | | **Mobile Ordering Support & Maintenance** | $ 5 | | **Gaming Integration** | $ 5 | | **Surveys** | $ 5 | | **inMoment Integration** | TBD | | **Beacon** | $ 5 | <br><br>The private-label app will include features and integration with Xpient, Granbury, & Datapoint POS systems as mutually agreed by both parties in the design phase of the project setup.<br><br>**Other Modules & Services not included in this order:** Any modules not specifically listed in this order form are available as an option to the Customer for commercial terms mutually agreed upon by both parties in a signed order form.<br><br>**Monthly Invoicing** of subscription services will be invoiced in advance of each month upon seven (7) days written notice between the parties identifying the total number of Customer locations expected to participate in the programs for the month.<br><br>(1): **Timing for beginning of payments**:<br><br>• **Setup fees**: The setup fee will be due within 30 days of entering this agreement.<br>• **Activation date**: Punchh and Customer will mutually agree upon an activation date for this solution, within 14 days of signing this contract. Customer agrees to (and provide permission for Punchh to) activate the solution by the mutually agreed upon activation date.<br>• **Monthly subscription services start date**: Customer agrees to start payments for monthly subscription services starting on the activation date. The payments will be due even if, for any reasons other than readiness of the solution, Customer decides to postpone the activation date of the solution.<br><br>**POS Integration:** Punchh will provide the integration packet, documentation, training, and support for POS integration. Customer is required to distribute and install the Punchh-provided POS integration. Punchh may provide full distribution and terminal installation services for a separate fee.<br><br>**Email Campaigns:** Campaigns that include email distribution will be distributed through a third party provider at cost.<br><br>• We are currently fully integrated with and recommend Sendgrid |
| **Number of Locations**: | All current and future locations. Current locations: 457 <br> We expect all locations to go live & opt-in to additional modules, but if for some reason a significant subset of the |

| | locations do not participate, Punchh will still charge a minimum monthly subscription fee for a 200 location floor. |
|---|---|

**Professional Services Details:**

| Services Description | Price |
|---|---|
| **Customer Notification Collateral Design –** Design mobile app, Punchh card, loyalty program(s), counter-top displays, table-top displays, stickers, and digital display | Included |

This Order Form (the "Order") is entered into by and between Punchh, Inc. with its principal place of business at 530 Lakeside Dr. Suite 240, Sunnyvale, CA 94085 ("Punchh"), and the Customer listed above ("Customer"). This Order constitutes a purchase commitment incorporating and subject to the terms in this Order and the terms and conditions of the Services Agreement of which this is made a part (altogether the "Agreement"), and is effective as of the date this Order Form is signed by the Customer (the "Effective Date"). The Term shall begin as of the later of the Services Activation Date listed above and the date this Order is signed by the Customer.

   IN WITNESS WHEREOF, the parties' have caused this Order Form to be signed by their duly authorized representatives.

**Punchh, Inc.:**                 **Customer:**

Signature: _____    Signature: *Sarah McAloon*
                      Sarah McAloon (Mar 31, 2015)

Print Name: ____Teddy Grossman_____    Print Name: Sarah McAloon

Title: __Vice President, Sales_____    Title: CMO

                   Date Signed: Mar 31, 2015

## EXHIBIT B – SERVICE LEVEL AGREEMENT

1. **Additional Terms**.  Capitalized terms not defined below will have the meaning ascribed to them in the Agreement.  Additional terms used in this Service Level Commitment are defined below.  References herein to days are business days (Monday through Friday excluding federal bank holidays) and references to hours during a business day.

   1.1   "*Downtime*" means any period of time during Service Hours in which any Customer is entitled to access but is unable to transmit or receive information from the Services due to a problem with the Services.

   1.2   "*Monthly Service Hours*" means the total of the Service Hours within the Service Month.

   1.3   "*Problem*" means a failure of the Private-Label App to function properly.

   1.4   "*Scheduled Downtime*" means (i) upgrades of hardware or software to the Punchh Software, (ii) upgrades to increase capacity, (iii) daily backups and other daily processing, and (iv) other activity to maintain or improve the systems supporting Customer, including any reconfiguration of the Services, as requested by Customer, for which Customer has been given forty-eight (48) hours advance notice.  Downtime will be scheduled during non-peak usage hours except for agreed upon emergencies.

   1.5   "*Service Hours*" are 24 hours a day, 365 days a year excluding Scheduled Downtime.

   1.6   "*Service Level*" means a percentage calculated by subtracting the aggregate number of hours of Service Outage (or fraction thereof) from the Monthly Service Hours (each within a Service Month), and dividing the remainder by the Monthly Service Hours in such Service Month.

   1.7   "*Service Month*" is the period beginning on the first business day of the calendar month and ending on the last business day of the calendar month.

   1.8   "*Service Outage*" means any period of Downtime experienced by multiple Users during Service Hours, that is not related any of the following: (i) any Content provided by Customer or User; (ii) suspension of the Services for performance of illegal activities, spamming, or virus propagation by Customer or User; (iii) virus, worm, Trojan horse, or other contaminating or destructive feature contained in any Content; (iv) Scheduled Downtime; (v) attacks including, but not limited to, denial of services, viruses and hacking that are due to Customer's policies, actions or negligence.

   1.9   "*Services*" means the access to Punchh's platform, including hosting and other services performed pursuant to the Agreement and related to the Private-Label App.

   1.10   "*Support Hours*" are 8am – 6pm PST, excluding holidays and any Scheduled Downtime.

2. **Technical Support**.  Punchh will provide email support services to Customer's designated support contact during Support Hours, Monday through Friday excluding Federal Bank holidays.

3. **Response Times**. Punchh use best efforts to respond to the problem report according to the severity and response times described below.

| Severity Level | Description | Response Times |
|---|---|---|
| Severity 1 | Problem that causes a catastrophic failure of the Services, or renders the Services inoperative by any Customer such that no business can be conducted using the Private Label App. | Punchh will begin to investigate the Problem within two (2) hours of receiving a Problem report.  Punchh will attempt to resolve Problem within twenty-four (24) hours of receiving a Problem Report. |
| Severity 2 | Problem that causes the performance of the Services to be degraded (such as a loss of some functionality where there is a workaround), not directly affecting Customer's business, but where all or substantially all Customers can still use the Private-Label App. | Punchh will begin to investigate the Problem within twenty-four (24) hours of receiving a Problem report.  Punchh will attempt to resolve Problem within one (1) week of receiving a Problem Report. |
| Severity 3 | Problem in which certain elements of usability or certain functionality are impacted but most operations of the Services function normally. | Punchh will begin to investigate the Problem within one (1) week of receiving a Problem report. Punchh will attempt to resolve Problem within a mutually agreed upon time period. |

4. **Availability**.  The Services will be available 99.9% of the time, per Service Month during the Service Hours, excluding any Scheduled Downtime (the "*Required Service Level*").

5. **Service Outages**.  Punchh will monitor the Services and promptly record any Service Outage detected and notify Customer based on the Problem severity within the response times set forth below. Punchh will make commercially reasonable efforts to resolve each Problem reported under the terms herein that is found by Punchh to be due to a defect or error in the Services.  If the Problem reported by Customer is not due to a problem in the Services, Punchh will so notify Customer.

6. **Service Credit**. If the Service Level during any three consecutive Service Months is less than the Required Service Level, then Punchh will provide a proportional refund of the next month's Subscription Fees following the one in which such shortfall occurred (a "*Service Credit*").  If the Service Level has less than 93% uptime in any given Service Month, then Punchh shall refund all Subscription Fees for that month. Such Service Credits shall be applied only to the month following the month in which the Service Outage occurred and; provided, however, that the Service Credits shall not exceed the total of Subscription Fees paid by Customer in that month.

7. **Updates and Upgrades.** Following delivery of the Private Label App, Punchh shall provide a maximum of 3 Updates to the Private Label App upon request of Customer, excluding bug fixes to resolve Severity 1 or Severity 2 issues as defined in this Exhibit B. These 3 Updates shall be limited to support functionality improvement(s) and incremental operating system compatibility. Any Upgrades are not included in the Agreement. Punchh and Customer shall negotiate reasonable commercial terms for any Upgrades and/or Updates beyond the 3 provided for in this section.

## **EXHIBIT C - FUTURE RATE CONFIRMATION**

Assuming the current number of locations (+400) Punchh will extend the current Monthly Subscription Fees (as stated in Exhibit A) to future Services Agreements to be executed at the expiration of this contract.



Punchh, Inc. 1875 S Grant St #810, San Mateo, California 94402, United States
Telephone: (650) 781-7100

## ORDER #2

This **Order #2** ("**Order**") is made between Punchh, Inc. ("**Punchh**") and the entity signing this Order below ("**Customer**"). This Order is entered into under and form a part of the Punchh Master Services Agreement entered into by the parties dated March 31, 2015, (the "**Agreement**").

| CUSTOMER | CUSTOMER CONTACT | BILLING TERMS |
|---|---|---|
| Cici's Enterprises LP<br>5601 Executive Drive, Ste 400<br>Irving, TX 75038 | Billie Jo Waara<br>BWaara@cicispizza.com | Net 30<br>☒ Monthly ☐ Quarterly |
| **ORDER TERM** | **ORDER EFFECTIVE DATE** | **ACTIVATION DATE** |
| 36 months | January 7, 2019 | Upon signing |
| **OFFER EXPIRATION** | | |
| 15 days after the Effective Date upon close of business (CT) | | |

### PUNCHH SERVICES

| Product | Monthly Price Per Store | Locations | System-Wide Monthly Recurring Fee |
|---|---|---|---|
| **Loyalty Bundle**<br>Includes Punchh Dashboard, Loyalty, Campaigns, Program Manager, Segmentation and CRM, Analytics, Referrals, Ratings and Reviews<br>Spanish Compatibility | $65.00 | 420 | $27,300 |

**Total System-Wide Monthly Recurring Fees Payable**    $27,300

**Not Included:** Third Party Fees

### ORDER CONDITIONS

Any additional Services not specifically listed in this Order may be included under a separate Order or SOW with Punchh. Punchh may activate the Services under this Order as of the Activation Date.

The initial term of this Order is specified above under Order Term. Thereafter, unless extended by a subsequent Order, the Term will automatically renew for additional 12 month renewal periods, unless one party notifies the other in writing of its intention not to renew at least 90 days prior to the end of the initial period or any such renewal period.

**Early Termination** An early termination option is available to Customer through a $20,000 payment to Punchh and at least 6 months' written notice prior to planned termination of this Agreement.

All Fees specified in this Order as "Monthly Recurring" Fees are recurring Fees, due and payable in advance on or before the first day of each quarter/year as indicated above under Billing Terms following the Activation Date. Fees

are to be based on the greater of (a) the total number of locations specified in this Order or (b) the total actual or expected number of locations participating in the Services for each quarter/year, with any prepayments specified in this Order.

The payment of all Fees will be due as specified herein even if Customer decides to postpone the start of any Services until following the Activation Date for reasons other than Service readiness. Customer agrees to be invoiced for all Fees specified in this Order on an aggregate, system-wide basis (not per-store or per-franchise). All Fees are payable in US dollars. All Fees are non-refundable once paid.

## AGREED AND ACCEPTED BY

This Order is effective once signed by Customer. IN WITNESS WHEREOF, the parties' entered into and agreed to be legally bound by this Order by the signatures of their duly authorized representatives.

| Customer | Punchh |
|---|---|
| By: *[signature]* | By: *[signature]* |
| Name: BILLIE JO WRANA | Name: Emilia Brad |
| Title: CMO | Title: SVP, Customer Success |
| Date: 1/20/2019 | Date: 1/7/2019 |